UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ANNE P. POMERANTZ, Acting                Case No. 3:13-cv-1676-AA
Regional Director of the
Nineteenth Region of the                    OPINION AND ORDER
National Labor Relations Board,
for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

     Petitioner,

    v.

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION, LOCAL 4,

     Respondent,

   and

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION, LOCAL 8,

     Respondent,

   and

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION,

     Respondent.

_____

1 - OPINION AND ORDER

AIKEN, Chief Judge:

Petitioner Anne Pomerantz, in her capacity as the Acting Regional Director of the National Labor Relations Board, Region 19 (the Board), brings this Petition pursuant to § 10(l) of the National Labor Relations Act (the Act), seeking preliminary injunctive relief against Respondents International Longshore and Warehouse Union Local 4, International Longshore and Warehouse Union Local 8, and International Longshore and Warehouse Union (collectively, the Union).

The Board alleges that the Union has engaged in unfair labor practices with respect to Tidewater Barge Lines, Inc. (Tidewater), as a result of the Union's labor dispute with Marubeni-Columbia Grain, Inc. (CGI), the primary employer. Specifically, the Board asserts that the Union has engaged in unlawful secondary picketing of Tidewater barges and moorages on the Snake and Columbia Rivers, with the intent of forcing or requiring Tidewater to cease doing business with CGI or to intercede in the Union's labor dispute with CGI. The Board seeks preliminary injunctive relief enjoining the Union's unlawful picketing activities until the Board resolves Tidewater's pending charge against the Union.

The Union adamantly disputes the charge and maintains that its members are simply exercising their First Amendment rights to free speech. The Union contends that the National Labor

2 - OPINION AND ORDER

Relations Act, as interpreted by the Supreme Court, does not ban picketing activity directed at a neutral secondary party, such as Tidewater, who performs services that are "essential" to a primary employer's operations.

On October 10, 2013, the court heard argument from counsel for the Board, Tidewater, and the Union. After review of the evidence and arguments presented, I find that the Board is entitled to preliminary injunctive relief that enjoins Union picketing at Tidewater's facilities on the Snake and Columbia Rivers. The following constitutes the court's Findings of Fact and Conclusions of Law.

## BACKGROUND

Since the 1930s, the Union has represented grain handlers working in Pacific Northwest grain elevators. Through dispatch halls in Portland and Vancouver, Locals 4 and 8 hire out members for grain work in the region's grain export elevators. Currently, the Union is embroiled in a labor dispute with CGI and Mitsui-United Grain Corporation (UGC).

CGI is a grain exporter with grain elevator facilities along the Snake River in Central Ferry, Washington and at the Port of Wilma near Clarkston, Washington (the upriver facilities). At these facilities, CGI grain is loaded onto barges and then transported down the Snake and Columbia Rivers to CGI's grain export terminal at the Port of Portland.

3 – OPINION AND ORDER

Tidewater is a Delaware corporation engaged in the business of transporting various commodities up and down the Snake and Columbia Rivers by tug and barge. Tidewater has a transportation agreement with CGI to transport grain from CGI's upriver facilities to CGI's downriver export terminal in Portland.

Initially, Tidewater brings an empty barge from a nearby tie-off location, called a "spud barge," to the relevant CGI upriver facility. A spud barge is a floating dock anchored in place by steel pipes - called "spuds" - drilled vertically into the riverbed. After an empty barge is towed to the upriver facility, CGI employees load the barge with grain, and the barge is towed back to the spud barge. Tidewater then transports the loaded barge down the Snake and Columbia Rivers to one of three spud barges located near Hayden Island on the lower Columbia River.[1] From there, the loaded barge is towed downriver to CGI's export terminal at the Port of Portland. CGI employees unload

---

[1] At oral argument, the Board represented that the spud barges and tie-offs at issue are either owned or leased by Tidewater. The Union did not dispute this assertion. According to a Vice President of Tidewater, the moorage near Central Ferry is not actually a spud barge, but rather two barges tied to the beach. Pet.'s Ex. 4 at 3. For the sake of brevity, the court refers to Tidewater's spud barges and tie-off locations collectively as "spud barges."

Although the Union asserts that Tidewater barges used to transport the grain are "CGI barges" or "leased" to CGI, it presents no persuasive evidence to support its assertion. Compare Mullane Decl. at 2 with Curcio Decl. at 2 (Ex. B to Pet.'s Reply).

and store the grain and ultimately load it onto ocean-bound grain vessels. Tidewater transports empty barges back to the spud barges, and the process is repeated.

Tidewater's Central Ferry and Wilma spud barges are located approximately one mile from CGI's upriver facilities. Pet.'s Ex. 4 at 4. Tidewater has three spud barges near Hayden Island; these spud barges are between three and five miles from CGI's export terminal at the Port of Portland. Curcio Decl. at 3 (Ex. B to Pet.'s Reply).

The Union and CGI's labor dispute began after the bargaining agreement between the Union and the Pacific Northwest Grain Handlers Association (of which CGI and UGC are members) expired in September 2012. Union-represented employees continued to work without a contract while a new contract was negotiated. Contract negotiations between the parties eventually reached an impasse, and in February of this year UGC locked out its Union-represented workforce from its Vancouver, Washington export terminal; in May 2013, CGI followed suit with respect to its Portland export terminal. The Union contends that CGI and UGC have hired replacement workers at their respective export terminals, and that those facilities continue to receive grain from upriver facilities and load outbound ships. The Union admits it has no dispute with Tidewater.

5 - OPINION AND ORDER

In August 2013, the Union began water-borne picketing of CGI's upriver facilities. The Union picketers rotate between two or three small-craft recreational vessels, averaging about 19 feet in length, with signs stating, for example: "We are locked out. Columbia Grain unfair. ILWU"; "We are locked out. Columbia Grain Respect our Rights. ILWU"; and "An Injury to One is an Injury to all, Local 4." Pet.'s Exs. 3, 4, 11, 14.

Tidewater tug crews, represented by the Inlandboatmen's Union (IBU), would not cross the Union's water-borne picket lines to "spot" a barge in or out of CGI's upriver facilities. Accordingly, CGI hired a non-union transport company, JT Marine, to tow the barges between CGI's upriver facilities and the nearby spud barges. From the spud barges, Tidewater intended to transport the barges downriver to Hayden Island per its usual practice and agreement with CGI. CGI had hired another non-union company to shuttle barges between the Hayden Island spud barges and CGI's export terminal.

On August 19, 2013, the Board alleges that a boat carrying Union picketers followed two loaded Tidewater barges as JT Marine transported them from CGI's Wilma facility to the nearby spud barge. When a Tidewater tugboat approached the spud barge to pick up the loaded barges, the Union's picketers raised their signs and attempted to maneuver their boat between the Tidewater tugboat and the loaded barges. Eventually, the Tidewater tugboat

6 - OPINION AND ORDER

left without the loaded grain barges. The Board contends that the Union's picketing activity resumed whenever a Tidewater tugboat passed the spud barge. Pet.'s Ex. 3.

The Board further alleges that on August 23, 2013, Union picketers maneuvered their boat between a loaded grain barge moored at Tidewater's Wilma fuel dock, approximately 600 yards from its spud barge, and a Tidewater tugboat attempting to pick up the barge. The Board alleges that Union picketers prevented the tugboat from picking up the barge after several attempts. E.g., Pet.'s Exs. 11, 12.

Also on August 23, 2013, the Board alleges that a Union picket boat followed a Tidewater tugboat as it approached the Hayden Island middle spud barge to retrieve three empty grain barges. See Pet.'s Exs. 13-14. A second picket boat was located between the spud barge and the shoreline. As the tugboat approached the spud barge, the second picket boat began to move toward the barges. The Board maintains that when the tugboat came within a few hundred feet, the picketer announced through his bullhorn: "We are picketing these barges. This is a bona fide picket line of the ILWU."; "Turn your tug around and go back to the dock."; and "Let's run these scabs off our river." Pet.'s Ex. 14. The picketer also specifically mentioned CGI and UGC. Ultimately, the tugboat headed downriver without the three empty Tidewater barges. Pet.'s Exs. 13-14.

7 – OPINION AND ORDER

Finally, the Board alleges that on August 26, 2013, two Union picket boats were anchored about 150 feet from Tidewater's spud barge near Hayden Island upper, with one boat anchored near five empty grain barges. Three more picketers were standing on the south shore near Tidewater's Hayden Island middle spud barge. When the three picketers saw a Tidewater tugboat, they boarded a 23-foot aluminum boat and held up signs that read: "ILWU Local 8, Lockout Unfair"; "We are Locked Out. Columbia Grain"; and ""ILWU Longshoremen Locked Out." Pet.'s Ex. 11.

Tidewater tugboat crews continue to honor the Union's water-borne pickets at Tidewater spud barges and will not cross the picket lines to retrieve a Tidewater barge. As a result, Tidewater has filed a grievance alleging that its employees' actions violate the IBU/Tidewater labor agreement.

On August 26, 2013, Tidewater filed a charge with the Board in Case 19-CC-111986. The charge was referred to the Regional Director for Region 19. Following a review of the field investigation, the Regional Director found reasonable cause to believe that the Union is engaging in unlawful secondary picketing of Tidewater.

Accordingly, on September 18, 2013, the Regional Director issued a Complaint alleging that the Union is engaged in unfair labor practices in violation of §§ 8(b)(4)(i) and (ii)(B) of the Act. See 29 U.S.C. § 158(b)(4). On November 5, 2013, a hearing

8 - OPINION AND ORDER

on the Board's allegations is scheduled to commence before an Administrative Law Judge.

On September 20, 2013, the Board filed the instant Petition for Preliminary Injunctive Relief. The Board asserts that it has established the likelihood that the Union is engaging in unfair labor practices, and that preliminary injunctive relief is necessary to enjoin the ongoing harm to Tidewater and other neutral parties while the Board's Complaint is pending.

## DISCUSSION

The Board filed the instant Petition pursuant to § 10(l) of the Act, which authorizes an officer or regional attorney, on behalf of the Board, to petition a district court for appropriate injunctive relief upon finding "reasonable cause" that a charge alleging unfair labor practices is true. 29 U.S.C. § 160(l). Further, § 10(l) authorizes a district court to grant injunctive relief that is deemed "just and proper." Small v. Avanti Health Systems, LLC, 661 F.3d 1180, 1187 (9th Cir. 2011); Overstreet v. United Broth. of Carpenters & Joiners of Am., Local No. 1506, 409 F.3d 1199, 1206 (9th Cir. 2005).

However, the fact that the Board has reasonable cause to believe that an unfair labor practice is occurring does not necessarily mandate injunctive relief by this court. Rather, the court must determine whether the relief sought is "just and proper" under traditional equitable criteria. See Small, 661

9 - OPINION AND ORDER

F.3d at 1187; Overstreet, 409 F.3d at 1206-07. Thus, the Board must show a likelihood of success on the merits and of irreparable harm, and that the balance of hardships and the public interest weigh in favor of the relief sought. Small, 661 F.3d at 1187 (citing Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008)).

Further, given that the request for injunctive relief implicates the Union's First Amendment rights, the Board must make "particularly strong showings" of the likelihood of success on the merits and of irreparable harm. McDermott v. Ampersand Publ., LLC, 593 F.3d 950, 958 (9th Cir. 2010); Overstreet, 409 F.3d at 1208 n.13. The Board maintains that the court should not utilize the heightened standard, because the First Amendment does not protect the Union's unlawful secondary picketing. However, in determining whether the heightened standard applies, the court need not "'decide whether the First Amendment *does* protect the [Union's picketing], or even whether it probably does.'" McDermott, 593 F.3d at 959 (quoting Overstreet, 409 F.3d at 1209). Instead, the court "need only determine whether granting the Regional Director's injunction request would create 'at least some risk that constitutionally protected speech will be enjoined.'" Id. (quoting Overstreet, 409 F.3d at 1208 n.13). I find that the requested relief would pose "at least some risk" to protected speech in this case and apply the heightened

10 - OPINION AND ORDER

standard accordingly.

A.    Likelihood of Success on the Merits

Resolution of the Board's Petition rests in large part on whether the Union is engaging in picketing activity directed at a primary employer, CGI, or whether its picketing activity is directed at a neutral secondary party, Tidewater. If the Union's picketing is deemed secondary, the court must determine whether the picketing is intended to force Tidewater to cease doing business with CGI or otherwise embroil Tidewater in the Union's labor dispute with CGI.

Pertinent to this case, § 8(b)(4) renders it unlawful for a union to "induce or encourage" another engaged in commerce to refuse to "transport, or otherwise handle . . . any goods, articles, materials, or commodities," or to "threaten, coerce, or restrain" another engaged in commerce; when "an object" of such conduct is to "forc[e] or require[e] any person to cease using, selling, handling, transporting, or otherwise dealing in the products" of another, "or to cease doing business with any other person." 29 U.S.C. §§ 158(b)(4)(i) and (ii)(B). This prohibition is "directed toward what is known as the secondary boycott whose sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it." Local 761, Int'l Union of Elec., Radio & Machine Workers v. Nat'l Labor Relations Bd., (General Elec.), 366 U.S.

667, 672 (1961) (citation and internal quotation marks omitted).

In other words, the Act prohibits a labor union from "picketing against an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer" or to become involved in the union's dispute with the primary employer. Nat'l Labor Relations Bd. v. Local 3, Int'l Broth. of Elec. Workers, 471 F.3d 399, 402 (2d Cir. 2006) (quotation marks and citation omitted); Iron Workers Dist. Council of Pac. Nw., Local 29 v. Nat'l Labor Relations Bd., 913 F.2d 1470, 1475 (9th Cir. 1990).

The Board cannot and does not contest the Union's right to picket CGI's upriver facilities; such picketing is "traditional primary activity" targeting the primary employer. General Elec., 366 U.S. at 672, 681. Rather, the Board alleges that the Union's picketing activity at Tidewater's spud barges constitutes secondary picketing directed at a neutral secondary employer. The Board emphasizes that CGI does not have grain facilities or operations on Tidewater's spud barges; thus, the Board maintains that the Union's picketing activities could not be directed at CGI and, instead, are intended to force or restrain Tidewater from doing business with CGI.

Generally, "[a] union may picket a primary employer at a job situs under the control of a secondary employer only if the picketing is primary in nature." Nat'l Labor Relations Bd. v.

12 - OPINION AND ORDER

Gen. Truck Drivers, Warehousemen, Helpers & Auto. Employees of
Contra Costa Cnty., Local No. 315 (Local No. 315), 20 F.3d 1017,
1021 (9th Cir. 1994). Picketing at a secondary employer's site
is considered primary activity if the site is proximate to the
primary employer's premises and the secondary employees provide
"essential" services related to the primary employer's "regular
operations." United Steelworkers of Am., AFL-CIO v. Nat'l Labor
Relations Bd. (Carrier), 376 U.S. 492, 499-500 (1964); General
Elec., 366 at 680-81. This rule is commonly known as the related
work doctrine. Local No. 315, 20 F.3d at 1022.

Here, the Union relies on the related work doctrine in
opposing the Board's Petition and request for injunctive relief.
The Union argues that Tidewater employees are performing
services - the retrieval of loaded barges and the delivery of
empty barges - that are essential to CGI's daily operations of
distributing and exporting grain. The Union emphasizes that none
of the picket signs contain statements directed at Tidewater and
instead target the primary employer, CGI. Thus, the Union
maintains that picketing Tidewater employees engaged in
transporting barges used for CGI grain, even at Tidewater's spud
barges, constitutes protected primary activity.

Unfortunately for the Union, the Board is correct that the
related work doctrine does not protect picketing at a neutral
site with no primary nexus or presence. See General Elec., 366

U.S. at 679-80 (related work doctrine applied to neutral gate on primary premises); Local No. 315, 20 F.3d at 1022. Granted, in Carrier the Supreme Court extended the related work doctrine to picketing on neutral property, a railroad spur track, located adjacent to the primary employer's premises. However, the Court emphasized that the spur track essentially served as an entrance to the primary's premises:

> The railroad gate adjoined company property and was in fact the railroad entrance gate to the Carrier plant. For the purposes of § 8(b)(4) *picketing at a situs so proximate and related to the employer's day-to-day operations is no more illegal than if it had occurred at a gate owned by Carrier.*

Carrier, 376 U.S. at 500 (emphasis added). Thus, to constitute primary activity, the neutral site must afford some nexus to the primary employer's premises and its daily operations.

Consequently, the Ninth Circuit has held that the related work doctrine does not apply to union picketing on property "neither owned by the primary employer nor proximate to the primary employer's premises." Local No. 315, 20 F.3d at 1022. In so ruling, the Ninth Circuit explained: "We are not persuaded that the Union's activities in picketing irrespective of the location at the [neutral property] . . . can be deemed a permissible primary boycott, just because the neutral employees perform work necessary to the normal operations of the primary employer." Id. at 1023. Thus, the Ninth Circuit found that

neutral gates at a secondary employer's rail terminal and a neutral drop-off site one mile away were not "reasonably proximate" to the gate used by the primary employer. Id. at 1024; see also Indust. Workers Local No. 657, 245 N.L.R.B 796, 798 (1979), aff'd 659 F.2d 252 (D.C. Cir. 1981) (related work doctrine did not apply where premises of primary employer and neutral party were "unconnected," "geographically distinct" and had entrances one-quarter of a mile apart).

Here, it is undisputed that CGI employees do not utilize the spud barges for CGI grain operations. Further, it is undisputed that Tidewater's Hayden Island spud barges are three to five miles from CGI's export terminal, and its Snake River spud barges are approximately one mile from nearby CGI's upriver facilities. Thus, the spud barges are not in reasonably proximity to CGI's premises, and the Union cannot rely on the related work doctrine; it simply "has no application" in these circumstances. Local No. 315, 20 F.3d at 1022; Indust. Workers Local No. 657, 245 N.L.R.B at 798-99. To rule otherwise would extend the doctrine far beyond its intended parameters.

Alternatively, the Union argues that CGI has asserted excessive involvement over Hayden Island upper, so as to extend "primary situs" to that location. The Union asserts that the Hayden Island upper spud barge is dedicated exclusively to barges transporting grain from CGI and UGC. The Union also

maintains that CGI owns the transport company now shuttling barges between Hayden Island and its export terminal, and that CGI has hired security personnel for Hayden Island upper. Thus, the Union maintains that Hayden Island upper, as a primary situs of CGI, is a lawful target of primary picketing.

I am not persuaded. Even if Tidewater reserves its Hayden Island upper spud barge for barges hauling CGI grain, this fact does not establish CGI's presence at Hayden Island. Further, the Board insists that CGI neither owns the relevant transport company nor employs security personnel at Hayden Island, and the Union presents no evidence to support its assertions. The Union thus fails to show that Hayden Island upper is an extension of CGI's primary situs. Accordingly, the Board has made a strong showing that the Union is engaging in secondary activity.

Even if the Union's picketing is presumptively secondary, I must determine whether the Union's "objective was not secondary." Local No. 315, 20 F.3d at 1024. To violate § 8(b)(4)(i)(B), secondary "[e]mployees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person." General Elec., 366 at 673 (citation omitted). Likewise, under § 8(b)(4)(ii)(B), the secondary activity must be "coercive" or "restraining" in furtherance of the same prohibited object. Thus, secondary

16 - OPINION AND ORDER

activity that is "designed to enmesh neutral parties in the union's dispute," Local No. 315, 20 F.3d at 1025, and "threaten[s] neutral parties with ruin or substantial loss" violates § 8(b)(4). Int'l Longshoremen's Ass'n v. Allied Int'l, Inc., 456 U.S. 212, 224 (1982) (internal quotation marks and citation omitted).

Here, the Union's pickets consist of one to three recreational-sized boats on public, navigable rivers. Further, the Union maintains that it has complied with safety zones established by the United States Coast Guard. Nonetheless, I cannot ignore the fact that the Union's picketing targets Tidewater employees at Tidewater spud barges when they attempt to transport CGI grain. Thus, the Union's conduct implies the intent to induce, if not coerce, Tidewater employees to refuse to transport CGI grain or to cease doing business with CGI. Pet.'s Exs. 3, 4, 11-14; General Elec., 366 U.S. at 674 ("[I]n the absence of admissions by the union of an illegal intent, the nature of acts performed shows the intent.") (quotation marks and citation omitted); Local No. 315, 20 F.3d at 1025.

Notably, the Union picketers are not patrolling all areas of the rivers and holding up their signs at all times to "publicize" their dispute with CGI. Rather, the picketers admittedly have directed their picketing at Tidewater tugboats approaching Tidewater spud barges. The Board contends, and the

17 - OPINION AND ORDER

Union does not deny, that the Union members cease picketing activity when Tidewater tugboats are not present and resume such activity when a Tidewater tugboat attempts to retrieve a barge. I find that the Union has all but conceded that the purpose of picketing Tidewater spud barges is to induce Tidewater tugboat crews to cease transporting CGI grain.

Further, certain aspects of the Union's picketing likely fall within conduct deemed "coercive" or "restraining." Indeed, I find troubling the allegations that several Union picketers allegedly maneuvered their picket boats between Tidewater tugboats and barges when the tugs were attempting to retrieve the barges for transport. Such activity is clearly "restraining" if not "coercive" and poses a danger to all involved, including the picketers. Moreover, such conduct clearly is directed at Tidewater - not CGI - with the intent that Tidewater cease, or at least suspend, its transport of CGI grain.

In sum, I find that the Board has made a strong showing that the Union is violating §§ 8(b)(4)(i) and (ii)(B) of the Act by picketing Tidewater's spud barges, thus inducing and encouraging Tidewater employees to refuse to transport or otherwise handle goods, materials, or commodities of CGI, or coercing or restraining Tidewater employees, with "an object" of forcing or requiring Tidewater to cease handling or transporting the goods, materials, or commodities of CGI.

18 - OPINION AND ORDER

B.   Irreparable Harm

The Board maintains that absent injunctive relief, the Union's actions have and will continue to harm Tidewater's business operations and impede interstate commerce. The Board emphasizes that at least twenty-two of Tidewater's barges are currently "locked up" due to the Union's unlawful picketing, representing about thirty-five percent of Tidewater's active grain fleet. Pet.'s Ex. 16. Further, the Board contends that other neutral barge operations with no connection to CGI are affected by the Union's picketing, as their barges are also "held hostage."[2]

The Union responds that the Board cannot establish a likelihood of irreparable harm for two reasons. First, the Union maintains that Tidewater has adequate remedies through the grievance it filed under its collective bargaining agreement with IBU; the Union asserts that the grievance procedure affords Tidewater the opportunity to compel its employees to refrain from honoring Union picket lines and to seek damages. The Union also argues that Tidewater may file a civil suit under the Labor Management Relations Act and seek damages for the alleged unfair

---

[2] While the Union asserted in briefing that the spud barges at issue are used exclusively for barges transporting CGI grain, the Board and Tidewater clarified at oral argument that the spud barges are also used for barges carrying non-CGI products. In fact, it is Tidewater's practice to string several barges together for downriver transport, including barges which do not contain CGI grain.

19 - OPINION AND ORDER

labor practices. Second, the Union contends that the alleged harm to Tidewater is exclusively economic, and that Tidewater's potential lost business and economic injury does not constitute irreparable harm if adequate compensatory relief is otherwise available. I disagree.

The Ninth Circuit has explained that "while a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect . . . that would likely not be cured by later relief." Frankl v. HTH Corp., 650 F.3d 1334, 1362 (9th Cir. 2011). Although Tidewater's harm is primarily economic, the economic loss is present, "deleterious," and results from secondary activity that is likely unlawful under the Act. Further, Tidewater represents that its inability to retrieve barges is causing harm to its reputation and could result in the permanent loss of business and jobs.

Accordingly, I find that the Board has made a strong showing of the likelihood of irreparable harm to Tidewater and other neutral parties in the absence of preliminary injunctive relief.

C.   Balance of Hardships and Public Interest

When "considering the balance of hardships, the district court must take into account the probability that declining to

issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." Small, 661 F.3d at 1196 (citation omitted). Thus, the Board argues that the balance of hardships tips in its favor, given that the eventual resolution of the Board's complaint will not remedy the ongoing harm to Tidewater. The Board also maintains that the public interest will be advanced if the court grants injunctive relief, because the Act is intended to protect against unlawful interference with interstate commerce, including secondary picketing of neutral parties.

The Union maintains that the balance of hardships tips in its favor because the relief sought by the Board would undermine the Union's ability to picket in furtherance of its primary dispute with CGI. The Union argues that the risk to its First Amendment rights outweighs any harm suffered by Tidewater pending resolution of the Board's Complaint. The Union further contends that the public interest favors protecting a union's right to picket.

For the reasons explained above, I find that the balance of hardships and the public interest tip in favor of the Board and Tidewater. If the Union's picketing is not enjoined, Tidewater will continue to suffer significant economic harm from the Union's likely unlawful secondary activity, as well as the

21 - OPINION AND ORDER

potential permanent loss of business and jobs. In contrast, if the Union is enjoined from picketing at Tidewater spud barges, its members may still picket CGI's grain facilities or otherwise engage in lawful primary picketing. Thus, injunctive relief will not prohibit the Union from publicizing its dispute with CGI.

## CONCLUSION

For reasons explained above, the Board's Petition (doc. 1) and Motion for Order Granting Preliminary Injunctive Relief (doc. 17) are GRANTED. Accordingly, IT IS HEREBY ORDERED:

Pending final adjudication of the pending administrative proceedings before the National Labor Relations Board, International Longshore and Warehouse Union Local 4, International Longshore and Warehouse Union Local 8, and the International Longshore and Warehouse Union, their officers, representatives, supervisors, agents, affiliated locals, employees, attorneys and all persons acting on their behalf or in participation with them are hereby enjoined and restrained from threatening, coercing, or restraining Tidewater Barge Lines, Inc. or any other person engaged in commerce or in an industry affecting commerce, in any manner or by any means, including picketing, where in any case an object thereof is to force or require Tidewater Barge Lines, Inc., or any other person engaged in commerce, or in an industry affecting commerce, to refuse to perform services and/or cease handling,

22 - OPINION AND ORDER

transporting, or otherwise dealing in the products of, or to cease doing business with Marubeni-Columbia Grain, Inc. (CGI), or any other person engaged in commerce, or in an industry affecting commerce, or with each other.

Further, International Longshore and Warehouse Union Local 4, International Longshore and Warehouse Union Local 8, and the International Longshore and Warehouse Union shall take the following affirmative action:

1. Provide each of their officers, representatives, supervisors, agents, affiliated locals, employees, attorneys and all persons acting on their behalf or in participation with them, with a copy of this Court's order and a clear written directive to refrain from engaging in any conduct inconsistent with this Order;

2. Provide Tidewater Barge Lines, Inc., with a copy of the Petition and with a copy of this Court's Order Granting Petitioner's Request for Preliminary Injunctive Relief;

3. Provide Tidewater Barge Lines, Inc., with written notice that Respondents will comply with the Court's Order Granting Petitioner's Request for Preliminary Injunctive Relief and specifically will not engage in any conduct prohibited by §§ 8(b)(4)(i) and (ii)(B) of the Act, including, but not limited to, engaging in picketing or threatening, coercing or restraining Tidewater, or any other person engaged in commerce,

23 - OPINION AND ORDER

or in an industry affecting commerce, where in any case an object thereof is to force or require Tidewater, or any other person engaged in commerce, or in an industry affecting commerce, to refuse to perform services and/or cease handling, transporting, or otherwise dealing in the products of, or to cease doing business with CGI, or any other person engaged in commerce, or in an industry affecting commerce, or with each other; and

4. Within twenty (20) days of the issuance of this Order, file with the District Court and serve a copy upon the Regional Director of Region 19 of the Board, a sworn affidavit from responsible officials of each of Respondents which describes with specificity how each of the Respondents has complied with the terms of this decree, including the exact locations where the Respondents posted the materials required under this Order and how and to whom Respondents have distributed the Court's Order and directive.

IT IS FURTHER ORDERED that, to assure compliance with the Court's Order, the United States Marshals Service IS DIRECTED to take those actions deemed necessary to enforce the provisions and prohibitions set forth in this Order. A copy of this Order shall be served upon the United States Marshal for the District of Oregon.

IT IS SO ORDERED.

24 - OPINION AND ORDER

DATED this _15th_ day of October, 2013.


_Ann Aiken_
Ann Aiken
United States District Judge